## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 12-2375 JB

DAVID SOLORIO,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Appeal of Detention Pending Trial, filed Sept. 26, 2012 (Doc. 28)("Detention Appeal"). The Court held a hearing on October 15, 2012. The primary issue is whether the Court should vacate the Honorable Lorenzo F. Garcia, United States Magistrate Judge's Detention Order Pending Trial, filed Aug. 28, 2012 (Doc. 21), and release Defendant David Solorio pre-trial on conditions. The Court finds that D. Solorio has met his burden of production to rebut the presumption that he should be detained pre-trial. The Court also finds, however, that the United States of America has shown D. Solorio to be a flight risk by a preponderance of the evidence, and has shown him to be a danger to the community by clear-and-convincing evidence. The Court, thus, affirms Judge Garcia's Detention Order Pending Trial, and denies D. Solorio's request to be released pre-trial.

### FACTUAL BACKGROUND

While many drug trafficking cases before the Court involve non-citizens, this case involves a United States citizen who was residing in Kansas. What is troubling about D. Solorio's request for pretrial release, however, is his lack of employment, the amount of cash he had on hand at the time of arrest, and his ties to Mexico. He made references to a brother that he said had ties to the

Mexican cartel.

1.      **Background and Criminal History.**

D. Solorio is a United States citizen.  See Detention Appeal ¶ 3, at 1.  D. Solorio was "essentially" raised in Garden City, Kansas, Detention Appeal ¶ 3, at 1, although he was born in Guanajuato, Guanajuato, Mexico, see United States Probation Office Bail Report at 1, dated Aug. 28, 2012 ("Bail Report").  D. Solorio resided in Guanajuato until he relocated to Garden City in 1990.  See Bail Report at 1.  D. Solorio was naturalized as a United States citizen on July 9, 2004, in Kansas, and he possesses a valid passport.  See Bail Report at 1.  D. Solorio states that he does not have ties to the Republic of Mexico, and that his entire family resides in the Garden City area. See Detention Appeal ¶ 3, at 1.  D. Solorio last traveled to Mexico in February, 2010, to visit family and friends, see Bail Report at 1, although he states that he does not have family residing in Mexico, see Detention Appeal ¶ 7, at 2.  D. Solorio's parents and five of his six siblings reside in the United States.  See Bail Report at 2.  D. Solorio has one sister who does not reside in the United States.  See id. at 2.  D. Solorio is in contact with his siblings on a weekly basis.  See id. at 2.  D. Solorio described the frequency of his visits to Mexico as bi-annual.  See id. at 1.

D. Solorio has been married to Marcella Rosas Solorio, a United States citizen, who is a life-long resident of Garden City, since 1997.  See Detention Appeal ¶ 4, at 1; Bail Report at 2.  M. Solorio has been employed in the banking industry as a personal banker for the past twelve years. M. Solorio is currently employed with the Golden Planes Credit Union in Garden City, where she works as a Loan Officer.  See Detention Appeal ¶ 4, at 2; Bail Report at 3.  D. Solorio's last education was his attendance at Garden City High School for eleventh grade.  See Bail Report at 2. The Golf Club at Southwind employed D. Solorio from March, 2012 as a maintenance groundskeeper.  See Detention Appeal ¶ 5, at 2; Bail Report at 2.  Before working at The Golf Club

at Southwind, D. Solorio was a stay-at-home dad, from 1997, through March, 2012.  See Bail Report at 2.  D. Solorio could not remember any other employment, although M. Solorio stated that D. Solorio worked briefly in the Ward's Garden Center in Garden City.  See id. at 2.

The Solorios have four children, all United States citizens, who attend school in Kansas.  See Detention Appeal ¶ 4, at 1.   The family owns a home in Garden City, see Detention Appeal ¶ 6, at 2, where they have resided since June, 2003, see Bail Report at 1.  The Solorios' residence and ownership of their home was verified by an inquiry of Thompson Reuters CLEAR[1] database and of M. Solorio.  See Bail Report at 1-2.  The Solorios are willing to post their home with the Court as surety bond.  See Detention Appeal ¶ 6, at 2.  The Solorios own a second home, a three-bedroom mobile home on a one-half acre property, from which they collect rental income.  See Bail Report at 2.

The Solorios have a provided information of their financial assets and liabilities.  See id. at 1-2.  The Solorios report $4,100.00 in monthly payroll income and $500.00 in monthly rental income.  The Solorios have $211,000.00 in other assets.  See id. at 2.  The Solorios have liabilities on their two homes and cars totaling $67,000.00.  The Solorios have monthly payments totaling $1,815.00 for payments on their homes, cars, monthly utilities, and insurance.  See id. at 1-2.

D. Solorio has limited criminal history and no history of violence, see Detention Appeal ¶ 1, at 1, although the United States Probation Office ("USPO") characterizes his criminal history as "significant," Addendum to Bail Report from United States Probation Officer Andrew F. Selph to the Honorable James O. Browning, dated October 15, 2012, at 1 ("Bail Report Addendum").  D.

_____

[1]"CLEAR" stands for Consolidated Lead Evaluation and Reporting, and is an investigative tool that allows users to search public records.   CLEAR, http://clear.thomsonreuters.com/clear_home/about.htm (last visited Nov. 19, 2012).

-3-

Solorio has been arrested four times in the past.  His first arrest, at the age of nineteen, occurred in Washington, Georgia.  D. Solorio was arrested for making false statements; he was found guilty of the offense in August, 1997, and received a deferred sentence.  See Bail Report at 5.  D. Solorio was arrested, at the age of twenty-three, in Wichita, Kansas, for the alleged offenses of: (i) sale/distribution of a controlled substance in a school zone; and (ii) unlawful possession of marijuana.  D. Solorio's case was dismissed without prejudice.  See id. at 5.  D. Solorio was arrested again in Wichita, at the age of twenty-four, for the alleged offenses of: (i) sale of cocaine; and (ii) unlawful possession of marijuana.  D. Solorio's case was once again dismissed without prejudice for these alleged offenses.  See id. at 5.  D. Solorio was arrested, at the age of thirty-six, in Garden City for lack of registration.  D. Solorio was found guilty of having no registration, and he was sentenced in March, 2011, to ten days of confinement for the offense.  See id. at 5.

Although D. Solorio's record indicates involvement with illegal drugs, he did not discuss any current alcohol or drug use with the United States Probation Office.  See id. at 3.  M. Solorio stated that her husband does not abuse substances.  See Bail Report at 3.  D. Solorio states that he is eligible to be released to the third party custody of La Posada Halfway House.  See Detention Appeal ¶ 6, at 2.  M. Solorio is supportive of her husband and is willing to assist with any conditions imposed on D. Solorio's possible supervised release.  See Bail Report at 2.  M. Solorio states that she was not aware of her husband's out-of-town travel, which resulted in his arrest.  See id. at 2.

## 2.     Circumstances of Charged Criminal Activity.

D. Solorio was charged with violations of 21 U.S.C. § 841 (b)(1)(A), Possession with Intent to Distribute Cocaine, and 21 U.S.C. § 846, Conspiracy, on August 27, 2012.  See Criminal Complaint at 1, filed Aug. 27, 2012 (Doc. 2).  D. Solorio's arrest on August 25, 2012, was the result of an investigation conducted by Homeland Security Investigation ("HSI") agents and federal agents

acting in an undercover capacity ("UCAs").  See Aff. of Gabriel Lucero ¶ 1, at 2, executed Aug. 27, 2012, filed Aug. 27, 2012 (Doc. 2)("Lucero Aff.").[2]  On or about August 25, 2012, HSI agents were informed by UCAs that a drug transaction was set to occur at the Home Depot parking lot in Rio Rancho, New Mexico.  See Lucero Aff. ¶ 6, at 3.  The UCAs had arranged a sale of cocaine, in an amount weighing approximately six kilograms.  See Lucero Aff. ¶ 6, at 3.  The agreed price was $24,000.00 per kilogram, and the intended purchasers were driving from Colorado to New Mexico to conduct the transaction.  See Lucero Aff. ¶ 6, at 3.

HSI agents viewed the alleged purchaser's vehicle, a white pickup truck with Colorado license plates, arrive at the Home Depot around 11:00 a.m. on August 25, 2012.  See Lucero Aff. ¶ 8, at 3.  The vehicle was occupied by the alleged purchaser, known by the UCAs, and an unknown individual.  See id. ¶¶ 6, 8, at 3.  The alleged purchaser was later identified as Uriel Esquivel, and the initially unidentified occupant of the vehicle was later identified as D. Solorio.  See id. ¶ 8, at 3.  Esquivel and D. Solorio parked their truck next to a black sport-utility-vehicle ("SUV"), which the UCAs had informed Esquivel and D. Solorio was their car.  See id. ¶ 9, at 3-4.

Upon arrival, D. Solorio asked the UCAs if he could get "ten to twenty keys of cocaine to Atlanta for [D. Solorio] and his brother."  id. ¶ 10, at 4.  D. Solorio informed the UCAs that his brother was a "money man" for some individuals with cartel ties who are located in Atlanta.  Lucero Aff. ¶ 10, at 4.  D. Solorio informed the UCAs that he had not been able to obtain cocaine for some time, because "several of their cocaine connections had been 'busted.'"  Id. ¶ 10, at 4.  D. Solorio told the UCAs that the cocaine, of which Esquivel had negotiated the purchase that day, belonged

---

[2]The Lucero Aff. is attached to the Criminal Complaint, and was filed with the Court, together with the Criminal Complaint, as Doc. 2.  The Court's citations are to the page numbers provided upon the documents' filing with the Court, and are located in the upper-right-hand corner of the Criminal Complaint and Lucero Aff.

to D. Solorio.  See Lucero Aff. ¶ 10, at 4.  Esquivel informed the UCAs that D. Solorio had been working with Esquivel for some time, and Esquivel was the only one to open one of the packages of cocaine before the purchase took place.  See id. ¶ 12, at 4.

When an UCA asked Esquivel to call the "money guy," D. Solorio told the UCAs that the "money guy" worked for him.  Id. ¶ 11, at 4.  D. Solorio told the UCAs that the "'money guy' would not have any problems if he were stopped by law enforcement because the money was in a false compartment."  Id. ¶ 11, at 4.  Approximately fifteen to twenty minutes after D. Solorio made a telephone call, a Silver Nissan Pathfinder[3] with Kansas License plates arrived at the Home Depot and parked next to the UCAs' black SUV.  See id. ¶ 13, at 4.  Omar Bustillos was later identified as the driver of the Pathfinder.  See Lucero Aff. ¶ 14, at 4.  When the Pathfinder arrived, D. Solorio, Esquivel, and Bustillos all went to the rear of the vehicle.  The UCAs witnessed Bustillos removing money from the back seat of the Pathfinder.  One UCA saw Bustillos hand money to both Esquivel and D. Solorio.  Esquivel told the UCAs that Bustillos had brought approximately $150,000.00 to the transaction.  See id. ¶ 15, at 4.  Bustillos handed a plastic bag to an UCA, and the UCA put the bag in the black SUV.  See id. ¶ 16, at 4.  The same UCA gave Bustillos and Solorio a blue duffle bag containing cocaine, and Bustillos placed the cocaine in the Pathfinder.  See id. ¶ 17, at 5.

Agents in the black SUV counted approximately $144,000.00 in cash in the plastic bag given to the UCA.  The blue duffle bag in the Pathfinder contained approximately six kilograms of cocaine.  See id. ¶ 18, at 5.  The cocaine was later weighed at 6,915.73 grams.  See Lucero Aff. ¶

---

[3]The Lucero Aff. indicates that a silver Nissan Armada, and not a Pathfinder, arrived after D. Solorio telephoned the "money guy."  Lucero Aff. ¶¶ 12-13, at 4.  At D. Solorio's detention hearing, the United States informed Judge Garcia that Lucero had made a mistake in his affidavit, and that the car which approached after D. Solorio made the phone call was a Nissan Pathfinder, and not a Nissan Armada.  See Liberty Court Player at 22:30-23:06 (Aug. 28, 2012)(Hurtado)("LCP").

20, at 5.

## PROCEDURAL HISTORY

D. Solorio was arrested on August 25, 2012, pursuant to a warrant and complaint which charged him with Possession with Intent to Distribute Cocaine and Conspiracy.  See Bail Report Addendum at 1.  D. Solorio was charged with violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), Possession with Intent to Distribute 5 Kilograms and More of Cocaine, and 21 U.S.C. § 846, Conspiracy.  See Response to Defendant's Appeal of Detention Pending Trial ¶ 1 at 1, filed Oct. 3, 2012 (Doc. 37)("United States' Response").  D. Solorio was indicted on September 25, 2012, for violations of 18 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2, the crime of aiding and abetting.  See Indictment at 1, filed Sept.25, 2012 (Doc. 30); United States' Response ¶ 3, at 1.

The USPO reported that D. Solorio poses a risk of nonappearance because of his: (i) lack of stable employment history; and (ii) ties and travel to Mexico.  See Bail Report at 3.  The USPO reported that D. Solorio poses a risk of danger, because of: (i) the nature of his alleged offense; and (ii) the presence of previous involvement with similar drug trafficking offenses in his arrest and conviction history.  See Bail Report at 3.  The USPO recommended that D. Solorio be detained before trial, "as it appears there is no condition or combination of conditions that will reasonably assure the appearance of this defendant as required or the safety of the community."  Bail Report at 4.

On August 28, 2012, Judge Garcia held a detention hearing as to D. Solorio.  Because D. Solorio waived his right to a preliminary hearing, see Waiver of Preliminary Hearing, filed Aug. 28, 2012 (Doc. 14), Judge Garcia found probable cause to charge him with Possession with Intent to Distribute Cocaine, Attempt, and Conspiracy, see LCP at 21:12-21:51 (Court, Medrano).  The United States requested, pursuant to 18 U.S.C. § 3142(e), that D. Solorio be detained pending trial,

as the United States asserted that D. Solorio is a flight risk and a danger to the community, and because the Bail Report states that no condition or combination of conditions would reasonably assure his appearance and the safety of the community.  See Motion for Detention Hearing, filed Aug. 27, 2012 (Doc. 9); LCP at 24:20-24:49 (Hurtado).

D. Solorio argued that he does not have ties to Mexico, because his entire family resides in the United States, and most are legal residents, if not citizens, such as his wife and children.  See LCP at 24:53-25:22 (Medrano).  D. Solorio asserted that, in addition to his family ties, because he was gainfully employed before his arrest, he has overcome the presumption that he is a danger to the community, and a flight risk.  See LCP at 25:23-30 (Medrano).  D. Solorio requested Judge Garcia to consider releasing him to the La Posada Halfway House, if not to the community at-large, and D. Solorio argued that there are conditions of release which could assure that he would not be a danger to the community, and that he would appear at court proceedings.  See LCP at 25:31-50 (Medrano).  D. Solorio informed Judge Garcia that he was willing to surrender his United States Passport, if released.  See LCP at 25:51-53 (Medrano).

Judge Garcia found that the existence of probable cause as to D. Solorio's charged offense involving cocaine -- a controlled substance -- and the presence of prior arrests involving controlled substances in D. Solorio's criminal history, counseled in favor of detaining D. Solorio pending trial under 18 U.S.C. §§ 3141(g)(1) - (3).  See LCP at 25:58-27:39 (Court).  Judge Garcia also noted that D. Solorio's charged offense carries a presumption of detention under 18 U.S.C. § 3142, and that D. Solorio had failed to overcome the presumption of detention.  See LCP at 27:39-28:05 (Court).  Judge Garcia concluded that D. Solorio had "failed to overcome the presumption; the presumption is applicable; the Defendant will remain in custody."  LCP at 28:06-15 (Court).  Judge Garcia thus ordered that D. Solorio be detained pending trial.  See Detention Order Pending Trial at 2; Bail

Report Addendum at 1.  Judge Garcia found, "by clear and convincing evidence . . . that the presumption applies and has not been overcome and at this time there are no terms or conditions for release."  Detention Order Pending Trial at 2.

D. Solorio's trial was set for November 13, 2012.  See Bail Report Addendum at 1.  The Court granted the parties' Joint Motion to Extend Pre-trial Motion Deadline by 60 Days and Continue November 13, 2012 Trial Setting, filed October 16, 2012 (Doc. 43), and set the trial for the Court's trailing docket to commence on January 2, 2013.  See Order Granting Extension of Pre-Trial Motions Deadline and Continue Trial Setting at 3, filed Oct. 22, 2012 (Doc. 44).

D. Solorio contends that there is no evidence that he poses a danger to the community, and "the simple fact that an individual is originally from a foreign country does not prove he is a flight risk."  Detention Appeal ¶¶ 6-7, at 2.  D. Solorio contends that the United States' argument that he is a flight risk because he is from Mexico is "stereotypical."  Detention Appeal ¶ 7, at 2.  D. Solorio is "prepared to present evidence to this Court to demonstrate that there are conditions that could be fashioned to ensure his appearance in court."  Detention Appeal ¶ 8, at 2.

D. Solorio argues that Congress has imposed "procedural safeguards designed to limit detention to only those instances when it is clearly necessary."  Detention Appeal ¶ 10, at 3 (citing United States v. Holloway, 781 F.2d 124, 125-26 (8th Cir. 1986); S. Rep. No. 225, 98th Cong. 1st Sess. 8 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3191).  D. Solorio asserts that any doubts regarding whether to detain him should be resolved in his favor, and, thus, in only "rare" cases should pretrial release be denied.  Detention Appeal ¶ 11, at 3 (citing United States v. Townsend, 897 F.2d 989, 994 (9th Cir. 1990)).  D. Solorio asserts that, "a defendant may be detained pending trial only if a judicial officer finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the

community.'" Detention Appeal ¶ 12, at 3 (citing 18 U.S.C. § 3142(e)).  D. Solorio contends that

a court must find that the United States of America has proved, by a preponderance, that a defendant

is a flight risk, and must prove that a defendant is dangerous to another person or to the community

by clear-and-convincing evidence.  See Detention Appeal ¶ 14, at 3-4; id. ¶ 17, at 4-5.

D. Solorio contends that, although his offense carries a presumption in favor of detention

pursuant to 18 U.S.C. § 3142, he has overcome the presumption.  See Detention Appeal ¶ 15, at 4.

 D. Solorio contends that, because he is presumed innocent of the charge offense, he has a

substantial liberty interest in avoiding pretrial detention.  See Detention Appeal ¶ 19, at 5.  D.

Solorio argues, thus, that "the district court must dispose of every alternative before ordering pretrial

incarceration under the Bail Reform Act."  Detention Appeal ¶ 19, at 5 (citing United States v.

Fernandez-Alfonso, 818 F.2d 477, 478 (9th Cir. 1987)).

Lastly, D. Solorio argues that he has "strong ties to family and his community, a steady work

history, and a limited criminal history," which militates in favor of release to the La Posada Halfway

House.  Detention Appeal ¶ 20, at 6.  D. Solorio contends that he has presented sufficient evidence

to show that he is neither a flight risk nor a danger to the community, and thus, the Court should

release him.  See Detention Appeal ¶ 20, at 6.

The United States opposes D. Solorio's Detention Appeal.  See United States' Response at

1.  The United States asserts that, although the United States has the burden of persuasion regarding

the risk of flight and dangerousness, D. Solorio must still produce evidence to rebut the presumption

in favor of his detention.  United States' Response ¶ 5, at 2.  The United States argues that D.

Solorio has "failed to meet the burden of production" in his Detention Appeal, "because he offers

this Court no new information that specifically addresses any of the factors this Court is allowed to

consider when reviewing his detention under 18 U.S.C. 3142(g)[sic]."  United States' Response ¶

6, at 2.  The United States argues that, pursuant to 18 U.S.C. § 3142(f), "the detention may be revised upon a showing by the movant that evidence exists which 'was not known to the movant at the time of the original detention hearing and that the new information has a material bearing on the issue whether'" conditions may be imposed during a defendant's supervised release that would ensure his appearance, and the safety of another person or the community.  United States' Response ¶ 7, at 3 (quoting 18 U.S.C. § 3142(f)(internal alterations omitted)).

The United States asserts that D. Solorio's family and community ties are not new information.  <u>See</u> United States' Response ¶ 8, at 3.  The United States also asserts that, even if D. Solorio had presented new information, he has not overcome the presumption of detention under the factors set forth in 18 U.S.C. § 3142(g).  The United States asserts that the nature and circumstances of D. Solorio's offense, which carries a mandatory ten-year prison sentence, have been enumerated by Congress and recognized by the Court as subject to the rebuttable presumption of detention under 18 U.S.C. § 3141(g).  <u>See</u> United States' Response ¶ 10, at 3 (citing <u>United States v. Disher</u>, 650 F. Supp. 2d 1131, 1136 (D.N.M. 2009)(Browning, J.)).

The United States also contends that the evidence against D. Solorio is substantial, arising from the attempted purchase of approximately seven kilograms of cocaine for approximately $150,000.00 in cash.  <u>See</u> United States' Response ¶ 11, at 3.  The United States argues that the size of this drug transaction indicates that D. Solorio "has graduated from the novice or apprenticeship program of a drug trafficking organization, and has attained some level of seniority."  United States' Response ¶ 11, at 3-4.  As evidence of this, the United States points to D. Solorio's conversation with an undercover agent, in which D. Solorio asked if the undercover agent could transport "twenty keys of cocaine to Atlanta for him and his brother," and that D. Solorio related to the agent that his brother is a "'money man' for some individuals with cartel ties who were in Atlanta."  United States'

Response ¶ 11, at 4 (quoting from the Lucero Aff. ¶ 10, at 4, filed Aug. 27, 2012 (Doc. 2)).  The United States argues that D. Solorio's situation raises concerns which the Court has recognized in the past warrant against releasing a defendant to a halfway house: "someone who can negotiate such a deal is likely to have either financial resources to leave the country, the support of an organization to help him leave, or both."  United States' Response ¶ 11, at 4.  The United States contends that D. Solorio's pay stub establishes an income of $10,000.00, yet D. Solorio was negotiating a purchase of almost seven kilograms of cocaine, and had requested ten to twenty grams of cocaine.  See United States' Response ¶ 11, at 4.  The United States contends that D. Solorio's attribution of the cartel ties to his brother is "immaterial," as D. Solorio "was present for this transaction and personally requested 10-20 kilograms of cocaine."  United States' Response ¶ 12, at 4.

The United States also argues that the nature and seriousness of the danger posed by D. Solorio's release supports his continued detention.  See United States' Response ¶ 13, at 4.  The United States argues that the Supreme Court of the United States, and "numerous circuits," have determined that possession with intent to distribute narcotics "constitutes a clear threat to the health, safety, and public welfare of the community."  United States' Response ¶ 13, at 4 (citing Harmelin v. Michigan, 501 U.S. 957, 1002 (1991); United States v. Pina-Aboite, 97 F. App'x 832, 836 (10th Cir. 2004)).  The United States asserts that the scope of D. Solorio's alleged transaction was "very large," thus, D. Solorio "appears to be a trusted and valued member of a drug trafficking group, and his release could well result in the continued distribution of drugs into the community."  United States' Response ¶ 13, at 5.

The Court held a hearing on October 15, 2012.  See Transcript of Hearing (taken Oct. 15,

-12-

2012)("Tr.").[4]  D. Solorio requested that the Court review his Detention Order Pending Trial, de

novo.  See Tr. at 3:1-4 (Johnson).  D. Solorio asserted that he is a United States citizen, and his

family, including his parents, some uncles, wife, and mother in-law, were present in support of him.

See Tr. at 3:5-11 (Johnson).  D. Solorio asserted that he was gainfully employed before he was

arrested and that he has not had any convictions whatsoever in his criminal history.  See Tr. at 3:12-

17 (Johnson).  The Court asked D. Solorio to comment on his employment, as the Court noted that

he was only employed from March, 2012, and that he had not been employed before that date.  See

Tr. at 3:23-4:3 (Court).  D. Solorio stated that, for many couples in America, one parent will stay

at home.  See Tr. at 4:3-5 (Johnson).  D. Solorio stated that, he stayed at home to care for the minor

children because M. Solorio has a very good job with a credit union, and has been employed for over

twelve years.  See Tr. at 4:5-13 (Johnson).  D. Solorio stated that his sixteen-year old son, whom D.

Solorio stated is on his way to play for a major league baseball team, required transportation to

Kansas City, Missouri, so one parent had to be available at all times to drive his son to his baseball

practice.  See Tr. at 4:14-19 (Johnson).  D. Solorio stated that major league teams are now scouting

his son.  See Tr. at 4:20-24 (Johnson).

D. Solorio also told the Court that the Solorios are willing to place their home as a surety to

guarantee the Court that he will appear for court proceedings.  See Tr. at 5:9-13 (Johnson).  D.

Solorio stated that he and his family understand that, if he should flee, his family would lose its

home.  See Tr. at 5:13-17 (Johnson).

D. Solorio took issue with the USPO's representation that D. Solorio has "extensive criminal

history."  Tr. at 5:18-21 (Johnson).  D. Solorio stated that he only has one prior conviction, which

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

he received at the age of eighteen for making false statements, and that his sentence for that offense was deferred.  See Tr. at 5:21-23 (Johnson).  D. Solorio stated that all other charges for which he was arrested were dismissed.  See Tr. at 5:23-25 (Johnson).  D. Solorio stated that he received a traffic ticket at the age of thirty-six, and he entered a plea to the offense, but that the traffic ticket "should not weigh heavily in making the decision" to detain or release D. Solorio.  Tr. at 6:5-6, 6:9-13 (Johnson).  D. Solorio contended that detention, under the Bail Reform Act, should be limited to situations where it is clearly necessary, but that, rather, in many cases detention seems to be the first option recommended.  See Tr. at 6:17-21 (Johnson).  D. Solorio contended that defendants with worse facts than his have been allowed pretrial release.  See Tr. at 7:7-9 (Johnson).  D. Solorio pointed to multiple incidents in which defendants who have been released to third-party custody have appeared for every hearing and trial.  See Tr. at 7:3-8:14 (Johnson).  D. Solorio contended that conditions could be imposed on his release that would ensure his appearance.  See Tr. at 8:15-17 (Johnson).

Regarding the circumstances of the alleged crime, D. Solorio explained that an undercover agent had been negotiating with a co-Defendant in the case for the purchase of cocaine, and they agreed upon the amount and price.  See Tr. at 8:25-9:6 (Johnson).  D. Solorio contended that the allegedly incriminating statements which the United States asserts D. Solorio made are allegations only and that D. Solorio is presumed innocent.  See Tr. at 9:10-18 (Johnson).  D. Solorio contended that the alleged conversation between the agent and D. Solorio should be challenged for its veracity.  See Tr. at 9:22-10:3 (Johnson).  D. Solorio stated that, during the alleged transaction, the undercover agent arrived and seized money from a hidden compartment in a vehicle present.  See Tr. at 10:4-12 (Johnson).

D. Solorio acknowledged that the alleged crime carries a presumption in favor of detention.

See Tr. at 10:13-16 (Johnson).  D. Solorio stated that his wife had stable employment for the last twelve years, with the same employer.  See Tr. at 10:22-25 (Johnson).  D. Solorio stated that his family has either recently moved, or is in the process of moving, to Kansas City for his son's baseball team.  See Tr. at 11:1-5 (Johnson).  The Solorios are keeping their home in Garden City, where D. Solorio's parents reside.  See Tr. at 11:5-8 (Johnson).  D. Solorio stated that his wife, who has no criminal history and is a United States citizen, is prepared to serve as a third-party custodian.  See Tr. at 11:9-12 (Johnson).  D. Solorio requested that the Court release him to La Posada Halfway House, in Albuquerque, New Mexico, if the Court is not comfortable releasing him to his wife.  See Tr. at 11:13-15 (Johnson).  D. Solorio stated that he has not visited Mexico for several years, and that all of his family resides in Garden City, or Kansas City, Kansas.  See Tr. at 11:16-18 (Johnson).  D. Solorio stated that his last visit to Mexico was three years ago, when he took his mother to Mexico to celebrate Mother's Day, and that Pretrial Services is incorrect in stating that D. Solorio's last visit to Mexico was in 2010.  See Tr. at 11:21-12:1 (Johnson).   D. Solorio stated that his only family in Mexico is his sister.  See Tr. at 12:5-7 (Johnson).

D. Solorio stated that he has a job waiting for him at the golf course in Garden City.  See Tr. at 12:20-12 (Johnson).  D. Solorio stated that his wife is willing to testify before the Court that "she is willing to be his third-party custodian and report any problems to the Court."  Tr. at 13:11-12 (Johnson).  D. Solorio stated that his wife understands the responsibility entailed in being a third-party custodian, and that his wife is not willing to jeopardize her or her children's future by losing their home.  See Tr. at 13:12-18 (Johnson).  D. Solorio stated that he will appear at every hearing.  See Tr. at 13:19-20 (Johnson).  D. Solorio stated that he has nothing in Mexico.  See Tr. at 13:20-21 (Johnson).  D. Solorio stated that his entire family is here, and he has a job in the United States.  See Tr. at 13:21-22 (Johnson).

-15-

The United States commented that D. Solorio's comparison of his case to others in which a defendant has been released before trial is problematic, because in each case the facts, criminal histories, situations, and evidence, are different.  See Tr. at 14:2-8 (Stanford).  The United States expressed concern over the amount of cocaine which D. Solorio had negotiated to purchase and over the amount of money which D. Solorio brought to the deal -- $150,000.00 in cash.  See Tr. at 14:13-16 (Stanford).  The United States asserted that the amount of money which was on the table, combined with D. Solorio's statements about ties to the cartel, was strong evidence.  See Tr. at 14:13-17 (Stanford).  The United States asserted that "courts have recognized that drug trafficking is an ongoing problem [and] when somebody's involved in drug trafficking at this level they likely have resources to flee, whether it[']s to Mexico, Canada, Europe who knows where." Tr. at 14:19-23 (Stanford). The United States stated that, although D. Solorio was innocent of some of the crimes for which he was previously arrested, there is a pattern of cocaine throughout his history.  See Tr. at 15:2-6 (Stanford).  The United States asserted that this is the case Congress was contemplating when it codified the rebuttable presumption in favor of detention.  See Tr. at 15:7-10 (Stanford). The United States also asserted that Pretrial Services has not characterized D. Solorio's criminal history as "extensive" as D. Solorio stated.  Tr. at 15:11-17 (Stanford).  The Court noted that it was surprised with the thinness of D. Solorio's criminal history.  See Tr. at 15:18-22 (Court).

The Court asked the United States what its concern is with releasing D. Solorio.  See Tr. at 16:10-12 (Court).  The United States stated that it is concerned both that D. Solorio will flee, and that he will pose a danger to the community by continuing to sell drugs.  See Tr. at 17:9-12 (Stanford).

The United States stated that, usually, mentioning ties to the cartel is just a way to boast so a criminal can gain credibility, and nothing more.  See Tr. at 16:13-17 (Stanford).  The United States

asserted that, in D. Solorio's case, however, it is concerned by the amount of cocaine D. Solorio was interested in purchasing, and the amount of cash he had on hand.  See Tr. at 16:17-18 (Stanford). The United States stated it is concerned that, if D. Solorio's boasting was true and he has ties to the cartel through his brother, then the cartel, or whoever is supplying D. Solorio's money, will try to keep him out of jail.  See Tr. at 16:22-17:5 (Stanford).

Regarding D. Solorio's employment history, the United States asserted that he seems to have been out of work for a long time.  See Tr. at 17:21-22 (Stanford).  The United States asserted that, based on his paycheck, "it looked like he was not earning a whole lot more than $10,000.00 to take home and he's showing up on a deal with $150,000.00 in cash."  Tr. at 17:23-25 (Stanford).  The United States asserted that, although M. Solorio has a job and has earned a decent income, "it gives me a [] bit of concern that he hasn't worked for that long and they're living -- I wouldn't characterize their lifestyle as lavish, but it seems like -- it seems a little that they're doing a little better than they should be on paper."  Tr. at 18:1-6 (Stanford).  The United States also asserted that D. Solorio's lack of employment or work outside of the home in ten years indicates a lack of reliability and responsibility, which is a concern if he is released, as the Court would be relying on D. Solorio's word that he will continue to appear at hearings and trial.  See Tr. at 18:7-11 (Stanford).

The United States stated that it is not very concerned about D. Solorio's ties with Mexico, given that D. Solorio has been in Kansas for a long time, a state that is not very close to the border. See Tr. at 18:15-18 (Stanford).  The Court inquired of the United States how strong it felt its case is, and the United States asserted that the evidence is unambiguous and strong.  See Tr. at 18:21-19:2 (Court, Stanford).  The Court inquired of the United States if it had a sense of Judge Garcia's concern and rationale for ordering D. Solorio's detention, and the United States responded that it "read it as being just kind of a blanket concern as to both" flight and danger to the community.  See

Tr. at 19:10-20 (Court, Stanford).

In reply, D. Solorio stated that the person who negotiated with the undercover agent for the purchase of cocaine was a co-Defendant and not D. Solorio.  See Tr. at 20:8-12 (Johnson).  D. Solorio stated that, other than the "uncorroborated" statements allegedly made to the undercover agent by D. Solorio regarding the cartel, there is no other evidence that D. Solorio or his family belongs to or has ties to the cartel.  See Tr. at 20:17-22 (Johnson).  D. Solorio asserted that his case is distinguishable from others with more egregious facts, because he was not the target of the investigation, he did not conduct the negotiation with the undercover agents, and there is no evidence that the money brought belonged to him.  See Tr. at 21:18-22 (Johnson).

Regarding D. Solorio's financial situation, D. Solorio stated that he lives in a modest home in Garden City, and that his wife earns approximatley $25,000.00 a year.  See Tr. at 22:1-4 (Johnson).  D. Solorio asserted that he earned approximately $13,200.00 from his few months of employment.  See Tr. at 22:4-7 (Johnson).  D. Solorio contended that evidence of ties to the cartel is nothing more than speculation.  See Tr. at 22:9-10 (Johnson).  D. Solorio stated that there is no evidence that he or his family has ties to the cartel or are involved in drug trafficking.  See Tr. at 22:10-12 (Johnson).  D. Solorio contended that the United States did not even know who he was before he was arrested on August 25, 2012.  See Tr. at 22:13-14 (Johnson).

D. Solorio again argued that he has overcome the presumption of detention by showing that conditions can be fashioned to release him and guarantee his appearance, and the safety of the community and individuals.  See Tr. at 22:18-22 (Johnson).

The Court stated that is it not as concerned with D. Solorio's criminal history as Judge Garcia may have been, and that it does not think that the criminal history is as significant as the USPO thought.  See Tr. at 23:2-6 (Court).  The Court stated that it is concerned, however,  with the

amount of drugs in the transaction.  <u>See</u> Tr. at 23:6-7 (Court).  The Court informed the parties that it will give the matter some thought.  <u>See</u> Tr. at 23:7-10 (Court).

The United States pointed out some last facts that gave it concern.  <u>See</u> Tr. at 23:11-12 (Stanford).  The United States pointed to M. Solorio's unawareness of her husband's travel to Albuquerque as "a little fishy."  Tr. at 23:14-19 (Stanford).  The United States asserted that it had tabulated the D. Solorios' income and expenses, and that their bills were almost as much as their income.  <u>See</u> Tr. at 23:21-23 (Stanford).

D. Solorio, in closing, requested the Court to consider releasing him to the halfway house, if not to M. Solorio.  <u>See</u> Tr. at 24:2-3 (Johnson).  D. Solorio asserted that, at this point, it is not known who set the amount of cocaine for the transaction, and it may have been the government or another co-defendant who set the stakes so high.  <u>See</u> Tr. at 24:5-9 (Johnson).  D. Solorio contended that he did not set that amount, as he did not negotiate the deal with the undercover agent.  <u>See</u> Tr. at 24:8-12 (Johnson).  The United States asserted that it feels the same way about releasing D. Solorio to the halfway house as it would if he were to be released to his wife.  <u>See</u> Tr. at 24:20-24 (Court, Stanford).

## <u>LAW REGARDING PRETRIAL DETENTION</u>

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 through 3150, a defendant may be detained pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence.  <u>See</u> 18 U.S.C. § 3142(f); <u>United States v. Cisneros</u>, 328 F.3d 610, 616 (10th Cir. 2003).  "The rules

concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  To determine whether pretrial detention is warranted, the judicial officer must consider the statutory factors set forth in 18 U.S.C. § 3142(g):

> (g)  **Factors to be considered.** -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning --
>
> > (1)  the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> >
> > (2)  the weight of the evidence against the person;
> >
> > (3)  the history and characteristics of the person, including --
> >
> > > (A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > >
> > > (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> >
> > (4)  the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g).

When a defendant is charged with certain crimes, however, a presumption arises that the defendant is a flight risk and a danger to the community.  See 18 U.S.C. § 3142(e)(3); United States v. Villapudua-Quintero, 308 F. App'x 272, 273 (10th Cir. 2009)(unpublished)(per curiam)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders).  18 U.S.C. § 3142(e)(3)(A) provides that a presumption of detention arises when "there is probable cause to believe that the person committed" certain drug offenses, specifically "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46."  18 U.S.C. § 3142(e)(3)(A).  The United States Court of Appeals for the Tenth Circuit has explained that "[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more." United States v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993).  Accord United States v. Holguin, 971 F. Supp. 2d 1082, 1088 (D.N.M. 2011)(Browning, J.).  "'Once the presumption is invoked, the burden of production shifts to the defendant.'"  United States v. Holguin, 791 F. Supp. 2d at 1087 (quoting United States v. Stricklin, 932 F.2d at 1354-55).

To determine whether the defendant has rebutted the presumption of detention, a court must consider: (i) the nature and  circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual that would be posed by release.  See 18 U.S.C. § 3142(g).  "Should the defendant satisfy his or her burden of production, the United States must then show by a preponderance of the evidence that the defendant

presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger

to the community." United States v. Holguin, 791 F. Supp. 2d at 1087 (citing United States v.

Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Stricklin, 932 F.2d 1353, 1354-55

(10th Cir. 1991)("[T]he burden of persuasion regarding risk-of-flight and danger to the community

always remains with the government.")).  Notably, however, even if the defendant meets his or her

burden of production, "the presumption remains a factor for consideration by the district court in

determining whether to release or detain." United States v. Stricklin, 932 F.2d at 1355.  Accord

United States v. Mercedes, 254 F.3d at 436.

## THE DISTRICT COURT'S STANDARD OF REVIEW

Section 3145(a) of Title 18 provides that a "court having original jurisdiction over the

offense" may review a magistrate judge's detention order or release order. 18 U.S.C. § 3145(a)-(b).

"The standard of review for the district court's review of a magistrate judge's detention or release

order under § 3145(a) is de novo." United States v. Cisneros, 328 F.3d 610, 616 n.1 (10th Cir.

2003).  "When the district court acts on a motion to revoke or amend a magistrate's pretrial

detention order, the district court acts de novo and must make an independent determination of the

proper pretrial detention or conditions for release." United States v. Rueben, 974 F.2d 580, 585-86

(5th Cir. 1992).  See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir.1985)(stating that a

district court's review of magistrate judge's order setting bond was de novo).

## ANALYSIS

The Court is not aware of a condition, or combination of conditions, that will guarantee D.

Solorio's appearance at court and that he will not be a danger to the community.  The statutory

presumption in favor of detention is present in D. Solorio's case, as he has been indicted for a drug-

trafficking offense for which the mandatory minimum sentence is ten years.  While D. Solorio has

met his burden of production in support of his appeal of his detention, the United States has shown, by a preponderance of the evidence, that he is a flight risk, and, by clear-and-convincing evidence, that he is a danger to the community.  The evidence against D. Solorio is weighty, and he faces a lengthy mandatory-minimum sentence.  Although D. Solorio has shown that he has family ties to the Garden City area, the proposed conditions of his release -- that he be released either to his wife, or to La Posada Halfway House, and that his family's home be posted as a surety bond of his appearance -- cannot adequately mitigate his temptation to flee, in light of the evidence mounted against him, the potential sentence he faces, and his ties to other communities.  Additionally, the likelihood that D. Solorio will pose a danger to the community by continuing to traffic cocaine is high, as D. Solorio appears to have the resources and incentive to acquire and move more cocaine. The Court, thus, will uphold Judge Garcia's order detaining D. Solorio pending his trial.

## I.    __THE STATUTORY PRESUMPTION IS PRESENT.__

The Grand Jury found probable cause to believe that D. Solorio aided and abetted the distribution of five kilograms or more of cocaine, and possessed with intention to distribute five kilograms and more of cocaine, contrary to 21 U.S.C. § 841(a)(1), and (b)(1)(a), in violation of 21 U.S.C. § 846.  "[T]he Tenth Circuit has explained that '[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more.'"  United States v. Moreau, No. 07-cr-0388-JB, 2007 WL 2219412, at *4 (D.N.M. May 7, 2007)(Browning, J.)(quoting United States v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993)).  See United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010)("A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which [s]he is charged." (citing United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985))).  "Thus, when the government presents an indictment including charges listed in section

3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention." United States v. Stone, 608 F.3d at 945. See United States v. Cruz, 23 F.3d 395, at *1 (1st Cir.1994)("The grand jury indictment . . . gave the district court probable cause to believe that appellant had committed a crime of violence . . . . This, in turn, triggered the rebuttable presumption contained in § 3142(e)." (citing United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991)(per curiam))); United States v. Silva, 7 F.3d at 1046; United States v. Quartermaine, 913 F.2d 910, 916 (11th Cir. 1990)("A grand jury indictment provides the probable cause required by the statute to trigger the presumption." (citing United States v. Hurtado, 779 F.2d 1467, 1479 (11th Cir. 1985))); United States v. Williams, 903 F.2d 844, at *1 (D.C. Cir.1990)(unpublished table opinion)("Courts of appeals, however, have uniformly held that a judicial officer may rely on a grand jury indictment to establish probable cause for the purposes of triggering the rebuttable presumption of section 3142(e)." (citing United States v. Vargas, 804 F.2d 157, 163 (1st Cir. 1986); United States v. Suppa, 799 F.2d 115, 118-19 (3d Cir. 1986); United States v. Dominguez, 783 F.2d 702, 706 n.7 (7th Cir. 1986); United States v. Hurtado, 779 F.2d 1467, 1477-79 (11th Cir.1985); United States v. Contreras, 776 F.2d 51 (2d Cir.1985); United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985); United States v. Mosuro, 648 F. Supp. 316, 318 (D.D.C. 1986))). Because probable cause exists to believe D. Solorio violated the statutory provisions -- which carry a ten-year minimum sentence under 21 U.S.C. § 841(b)(1)(A)(viii) -- a presumption arises "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(stating this presumption applies to Controlled Substances Act violations "for which a maximum term of imprisonment of ten years or more is prescribed").

II.     **THE COURT CONCLUDES THAT D. SOLORIO IS, BY A PREPONDERANCE OF THE EVIDENCE, A FLIGHT RISK.**

The Court concludes that it will detain D. Solorio pending trial.  The United States argues that D. Solorio should be detained pending trial, because he is, by a preponderance of the evidence, a flight-risk, and by clear-and-convincing evidence, a danger to the community.  The United States asserts that it has substantial evidence to show that D. Solorio will be convicted under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.  See United States' Response ¶ 11. at 3-4.  As such, the United States contends that no condition or combination of conditions will adequately deter D. Solorio's flight and ensure the community's safety.

D. Solorio argues that, in light of his United States' citizenship and strong family and community ties to the Garden City area, the Court should conclude that he is not a flight risk.  D. Solorio has offered to put up his family home, in Garden City, as a surety bond to guarantee his appearance at hearings and trial.  D. Solorio requests that the Court approve his release either to his wife, M. Solorio, who has agreed to be a third-party custodian, or to the La Posada Halfway House.

D. Solorio has met his burden of production in response to the statutory presumption favoring detention.  See United States v. Stricklin, 932 F.2d at 1355 ("The defendant's burden of production is not heavy, but some evidence must be produced.").  Although the burden is met, the presumption  "remains a factor for consideration by the district court in determining whether to release or detain."  United States v. Stricklin, 932 F.2d at 1355 (citation omitted).  The Court concludes that the United States has shown, by a preponderance of the evidence, that D. Solorio is a flight risk.  The Court also believes that the United States has shown, by clear-and-convincing evidence, that D. Solorio presents a danger to the community through his alleged past and potential future facilitation of cocaine sales and trafficking.  See United States v. Mercedes, 254 F.3d at 436;

United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government."). The Court also concludes that no condition or combination of conditions may adequately deter D. Solorio's flight. The evidence against him is weighty, in volume and strength. He appears to have financial resources beyond that for which his family income alone can account. Although the possibility of D. Solorio's flight to Mexico may not be large, as a release to Garden City would put D. Solorio several states away from the border, D. Solorio would still have the incentive, given the mandatory minimum sentence for his conviction, and resources, to evade authorities pending his trial. Because the Court "finds that no condition or combination of conditions will reasonably assure the appearance of [D. Solorio] as required . . . , [the Court] shall order the detention of the [D. Solorio] before trial." 18 U.S.C. § 3142(e)(1).

## A.     D. SOLORIO IS A FLIGHT RISK.

The Court finds, by a preponderance of the evidence, that D. Solorio is a flight risk. D. Solorio is charged with offenses that carry substantial sentences. D. Solorio has financial resources, and the ability to travel out of is home state, and out of the country. Accordingly, the Court concludes that, were D. Solorio released before his trial, it is more likely than not that he would flee.

### 1.     The Nature and Circumstances of the Crime Charged Demonstrate D. Solorio is a Flight Risk.

The crimes with which D. Solorio is charged carry substantial penalties. D. Solorio is charged with aiding and abetting the trafficking of cocain, and trafficking cocaine, crimes which carry a ten-year statutory minimum term of imprisonment. See 28 U.S.C. § 841(b)(1)(A)(ii). The Court has previously noted: "The rebuttable presumption in drug-trafficking cases is statutory, and arises out of Congress' concern that individuals involved in drug trafficking often have foreign

contacts and the ability to leave the country, and incentives to remain active in the drug trade."
United States v. Disher, 650 F. Supp. 2d 1131, 1136 (D.N.M. 2009) (Browning, J.)(citing United States v. Moreno, 30 F.3d 127, 1994 WL 390091, at *2 (1st Cir. 1994)(per curiam)). This concern regarding drug-trafficking is further illuminated by its inclusion in 18 U.S.C. § 3142(g) as a particular factor for consideration in making a determination regarding detention.  See 18 U.S.C. § 3141(g)(1)(requiring a judicial officer to consider "the nature and circumstances of the offense charged, including whether the offense. . . involves a . . . controlled substance," when determining whether conditions may be fashioned upon a defendant's release that would assure his appearance and the safety of any other person and the community).  D. Solorio has been charged with aiding and abetting the trafficking of cocaine, and trafficking a large amount of cocaine, and he faces a substantial sentence.  The Court therefore finds this factor counsels in favor of detaining D. Solorio pending trial.

### 2.    The Weight of the United States' Evidence Against D. Solorio Supports Finding that He is a Flight Risk.

The weight of the United States' evidence against D. Solorio favors detaining him before trial.  See 18 U.S.C. § 3142 (g)(2).  The affidavit against D. Solorio is based on sustained interactions with undercover Homeland Security Investigations undercover agents, who arranged a sale of cocaine with D. Solorio and his co-Defendants, Esquivel and Bustillos.  D. Solorio's aiding, abetting, and trafficking involvement is supported by the evidence before the Court.

The Affidavit of Gabriel Lucero, a Special Agent with Homeland Security Investigations, which supports the Criminal Complaint, sets forth that D. Solorio was present at the alleged drug sale and that D. Solorio had knowledge of the method used to hide the money which Bustillos brought to the sale.  See Lucero Aff. ¶ 10, at 4.  D. Solorio informed the undercover agents that he,

with his brother, would like to purchase more cocaine, and D. Solorio took ownership of the cocaine being purchased from the agents.  See Lucero Aff. ¶ 10, at 4 ("Solorio told the UCA that his brother was a 'money man' for some individuals with cartel ties whom were in Atlanta.").  Additionally, D. Solorio told the agents how Bustillos were able to transport their cash to the sale unnoticed-- they hid the cash in a false compartment in their car.  See Lucero Aff. ¶ 11, at 4 ("Solorio then told the UCA that the 'money guy' would not have any problems if he were stopped by law enforcement because the money was in a false compartment.").  D. Solorio represented that a "money guy" worked for him, who could fund more cocaine purchases with the agents.  Lucero Aff. ¶ 11, at 4 ("Esquivel asked Solorio to call the 'money guy,' Solorio told the UCA that the 'money guy' worked for him.").  Esquivel, who allegedly negotiated the price and the location, informed the agents that D. Solorio had been working with him for some time.  See Lucero Aff. ¶ 12, at 4 ("Esquivel also told the UCA that he had been working with Solorio for some time and that Solorio was his nephew.").  On the other hand, there may be problems with the United States' case, as D. Solorio's counsel has pointed: (i) D. Solorio was not known to the government until he arrived at the transaction; (ii) the statements made to the undercover agents are uncorroborated; and (iii) D. Solorio did not negotiate the alleged deal or decide on the amount of cocaine to be purchased.  The Court believes, however, that the totality of the circumstances supports finding that the United States' evidence against D. Solorio counsels for pretrial detention.  D. Solorio was observed coordinating with Esquivel, who negotiated the sale, he allegedly had knowledge of the mechanics of the trafficking process, and he allegedly represented that he has other people in the drug-trafficking business working for him with whom he would like to arrange more cocaine trafficking.  The United States "need not offer all of its evidence" at the detention stage of the criminal proceeding, and thus, there may be even more evidence of D. Solorio's guilt that will be brought

forth at trial.  United States v. Cisneros, 328 F.3d at 618.  The Court thus finds that this factor weighs in favor of pretrial detention.

### 3.      D. Solorio's History and Characteristics Demonstrate That he is a Flight Risk.

D. Solorio's history and characteristics further support his pretrial detention.  Some of D. Solorio's history and characteristics weigh against his detention.  He has four children, he has been married for fifteen years, and he is a United States citizen.  He does not have an extensive criminal history, and he does not have a history of truancy at court proceedings.

On the other hand, D. Solorio travels approximately every-other year to Mexico, where he still has friends and family.  See United States v. Cisneros, 328 F.3d at 618 (noting a defendant's "close family in Mexico . . . and that in the past [the defendant] has traveled to Juarez with a sister and other family members" weighed in favor of detention).  Although most of D. Solorio's family is in the United States, he has a sister in Mexico.  His bi-annual travels to Mexico evince that D. Solorio has ties in Mexico and that he may be able to seek shelter there were the Court to release him before trial.  He has stated that he has ties to a cartel, and given his limited income and the amount of cash he allegedly brought to the drug deal, his representations have support.  D. Solorio has not been employed regularly, which could incentivize his evasion of the Court so that he may continue his alleged involvement with drug trafficking as a source of money.  Additionally, D. Solorio may have income from other sources besides his family's paychecks, as he arrived at a drug-transaction with $150,000.00 in cash, with other Defendants, and D. Solorio allegedly represented that he could procure more money to fund the trafficking of more cocaine.  D. Solorio's access to outside income suggests ties with organizations or individuals who may attempt to keep him out of court.  D. Solorio more likely than not has more mobility than his income and family situation would

suggest.  Certainly the lack of regular employment and the possibility of a ten-year sentence could incentivize his flight.  The Court thus believes that D. Solorio's history and characeristics, on balance, evince that he is a flight risk.

In sum, by a preponderance of the evidence, D. Solorio is a flight risk, given the serious penalty he faces, his connections to Mexico and ability to travel there, and the strength of the evidence against him.  On balance, while D. Solorio has presented evidence of his ties to the community, his ties are insufficient to prevent his flight.  In light of the severity of the sentence which D. Solorio is facing, the strength of the evidence against him, and his ties to Mexico, the Court does not believe it can impose conditions that would adequately deter D. Solorio's flight and give itself and Pretrial Services the comfort that he would appear.  The Court does not believe that the proposed conditions -- releasing D. Solorio to the custody of his wife, posting the family home as a surety bond, or releasing D. Solorio to the La Posada Halfway House -- are adequate to assure his appearance at court.  Regardless when planned, if he wants to flee, to Mexico or elsewhere, he has the reason and incentive to do so.

### B.   D. SOLORIO IS A DANGER TO THE COMMUNITY.

The United States has presented evidence that D. Solorio is a danger to the community, and the Court believes the evidence is clear-and-convincing.  Because the United States has presented probable cause supporting D. Solorio's federal charges, the statutory presumption that D. Solorio poses a danger to the community is triggered.  Even though D. Solorio has met his burden of production in response to the statutory presumption favoring detention, the presumption remains a factor for the Court to consider in making its ultimate determination regarding detention.  See United States v. Stricklin, 932 F.2d at 1355 ("Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to

release or detain."). D. Solorio is charged with aiding and abetting the sale of cocaine, and trafficking a large amount of cocaine, which "threatens to cause grave harm to society." Harmelin v. Michigan, 501 U.S. 957, 1002 (1991)(stating that the "possession, use, and distribution of illegal drugs represent one of the greatest problems affecting the health and welfare" of the United States). Thus, beyond the presumption, the federal charges provide reason to deem D. Solorio a danger to the community. See United States v. Pina-Aboite, 97 F. App'x 832, 836 (10th Cir. 2004)(recognizing that the 18 U.S.C. § 3142 "danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community" (citing United States v. Cook, 880 F.2d 1158, 1161 (10th Cir. 1989))). Because D. Solorio does not have regular employment to return to, and because he appears to have the resources to continue trafficking cocaine, he would have the incentive and the means to continue trafficking cocaine if he is not detained. Although D. Solorio does not have an extensive criminal history, his incentive and ability to continue on the path of dereliction is high.

In the end, D. Solorio's danger to the community is closely linked to his risk of flight. His wife did not have know about his travel to New Mexico, so she seems to have little control over his alleged drug trafficking activities. She is unlikely to be an adequate third-party custodian. If the Court put him in the Albuquerque halfway house, the Court is concerned that he will just be closer to the Mexico border and the cartels, to which he has said he has ties. Electronic monitoring or GPS devices would thus be little help, because he could be in Mexico by the time the USPO is aware he has left or cut the bonds to his body. And once he leaves, it is likely he will return to drug trafficking here or in Mexico, given that the evidence strongly suggests that is the only lifestyle he has known; he has lots of cash and assets, but is not employed. In sum, the Court is concerned that the picture it has of D. Solorio is one who has been employed in drug trafficking at a high level for

a number of years, and that he is connected to the cartel, with whom his further work would create

a high interest not to see him spend time in an American prison.

The Court thus finds, that, "no condition or combination of conditions will reasonably assure

the appearance of the person as required and the safety of any other person and the community."

18 U.S.C. § 3142(e).  The United States has shown, by a preponderance of the evidence, that no

combination of the proposed conditions of releasing D. Solorio to his wife, or to a halfway house,

or posting the D. Solorio's home as a surety bond, can guarantee that D. Solorio will withstand the

temptation to evade a mandatory ten-year sentence and appear at trial, in light of the evidence

mounted against him.  Further, the evidence of D. Solorio's danger to the community is clear-and-

convincing, because the likelihood that he will participate in more cocaine trafficking is high, as he

has the ability and incentive to continue this elicit business.  The Court orders, thus, that D. Solorio

be detained before his trial.

**IT IS ORDERED** that Defendant's Appeal of Detention Pending Trial, filed Sept. 26, 2012

(Doc. 28), is denied, and the Court: (i) will not vacate the Honorable Lorenzo F. Garcia, United

States Magistrate Judge's Detention Order Pending Trial, filed Aug. 28, 2012 (Doc. 21); and (ii)

orders David Solorio's detention pending trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Jon K. Stanford
   Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorney for the Defendant*